

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION

UNITED STATES OF AMERICA

v.

OSCAR J. GOMEZ
PAULINA F. GOMEZ
MANUEL VILLAREAL
ELOY LIRA
MICHAEL MARTINEZ
BROOKS STALLINGS

CRIMINAL COMPLAINT

CASE NUMBER: 2:06mj2

### CRIMINAL COMPLAINT

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

That from sometime in April 2005 until May 3, 2006, in Forest County and elsewhere, in the Hattiesburg Division of the Southern District of Mississippi, the defendants, **OSCAR J. GOMEZ, PAULINA F. GOMEZ, MANUEL VILLAREAL, ELOY LIRA, MICHAEL MARTINEZ,** and **BROOKS STALLINGS**, did knowingly and intentionally conspire to possess with intent to distribute 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine hydrochloride, a Schedule II(a) narcotic drug controlled substance, in violation of Section 841(a)(1), Title 21, United States Code.

I further state that I am a Special Agent with the Drug Enforcement Administration and that this complaint is based on the following facts:

*See* attached Affidavit.

Continued on the attached sheet and made a part hereof: __X__ Yes _____ No

TERRY E. DAVIS, Special Agent
Drug Enforcement Administration

Sworn to before me and subscribed in my presence,

05-03-06 at Gulfport, MS
Date

United States Magistrate Judge

STATE OF MISSISSIPPI
COUNTY OF HARRISON

## AFFIDAVIT

Your Affiant, Terry E. Davis, being duly sworn, deposes and states the following:

1. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

## AFFIANT'S BACKGROUND

2. I am a Special Agent with the Drug Enforcement Administration and have been so employed since November 2004. I am currently assigned as a Special Agent with the Drug Enforcement Administration's Gulfport Resident Office. The DEA Task Force in Gulfport, Mississippi, is comprised of Special Agents from the DEA, Special Agents from the Bureau of Immigration and Customs Enforcement ("BICE"), Agents from the Mississippi Bureau of Narcotics ("MBN"), and Detectives from the Biloxi Police Department (BPD), Gulfport Police Department (GPD), Waveland Police Department (WPD), Harrison County Sheriff's Office (HCSO), and the Jackson County Sheriff's Office (JCSO). I have been assigned to the DEA Gulfport Resident Office since November 2004. Prior to my employment as a DEA Special Agent, I was employed by the Gulfport Police Department (GPD) for six years. From 2000-2004, I was assigned as a DEA Task Force Officer to the Gulfport Resident Office. Prior to employment by GPD, I was employed by the Meridian Police Department (MPD) for two years.

3. My training and expertise includes: graduation from a Mississippi "P.O.S.T." certified Police Academy; Basic and Intermediate "P.O.S.T." certificate; Undercover narcotics instructor liaison and field training officer; graduation from the Drug Enforcement Administration Training Academy. As a law enforcement officer, I have received over approximately 600 hours of specialized drug training relating to various manufacturing processes, packaging techniques, transportation and sales of named narcotics. As a former DEA Task Force Officer (TFO) and now as a DEA Special Agent, my duties have included investigating violations of federal laws concerning the unlawful importation of controlled substances, the distribution of controlled substances, and the possession with intent to distribute controlled substances, including cocaine, marijuana, methamphetamine and other dangerous drugs.

4. During my career as a DEA TFO and Special Agent, I have participated in numerous narcotics investigations involving drug trafficking, including investigations that have involved court authorized interception of wire, oral and electronic communications. During this time, I have attended specialized training conducted by the various law enforcement agencies and I have become familiar with the types and amounts of profits made by narcotics smugglers. I am also familiar with their methods, including language and terms, which are used to disguise the source and nature of the profits from their illegal narcotics dealings. On many occasions, I have personally interviewed confidential sources to gather and corroborate evidence of narcotics trafficking.

5. I have conducted or participated in physical and wire surveillances, including previous Title III investigations, undercover transactions, the introduction of undercover

agents, the execution of search warrants, debriefing of informants and reviews of taped conversations and drug records. I have also been the Affiant for state and federal search warrants and arrest warrants. Currently, my primary duties at the DEA involve the investigation of organized narcotics traffickers.

6. I am currently participating in this multi-agency narcotics investigation. The investigation is being conducted by agents from DEA, BICE, MBN, as well as representatives from other state, city and county police agencies.

7. I am familiar with the facts and circumstances described herein and make this affidavit based upon personal knowledge derived from my participation in this investigation, including conclusions I have reached based on my training and experience, and upon information I believe to be reliable from the following sources:

   a. Oral and written reports about this investigation and other investigations which I have received from federal agents and local law enforcement agencies;

   b. Physical surveillance conducted by federal and local law enforcement agents, the details of which have been reported to me either directly or indirectly;

   c. Telephone records, including toll records, pen registers and subscriber information;

   d. Information developed from cooperating sources and defendants;

   e. Court-authorized wire interceptions; and,

   f. Public records.

8. Unless otherwise noted, when I assert that a statement was made, I received the information from other law enforcement agencies, which provided the information to me, either verbally or in a written report. The agencies providing me with the

information may have received the information by way of investigative knowledge, confidential sources, and sources of information, or from other law enforcement sources.

## UNDERLYING FACTS AND CIRCUMSTANCES

1. On April 28, 2005, the Gulfport Resident Office received information from Mississippi Bureau of Narcotics (MBN) that an MBN confidential source had purchased a total of approximately one (1) kilogram of cocaine HCL from identified target, Brooks STALLINGS. During the transactions, the MBN agents uncovered information that STALLINGS was utilizing a Texas Source of Supply for the cocaine HCL.

2. On April 28, 2005, the Mississippi Bureau of Narcotics (MBN) made an application to a Mississippi Circuit Court Judge for a state wiretap order on Brooks STALLINGS Cellular South telephone number (601) 606-8406.

3. On May 1, 2005, STALLINGS was intercepted on the Mississippi wiretap contacting a Mexican male, later positively identified as Oscar GOMEZ. Through this wire information was developed that STALLINGS was purchasing kilogram quantities of cocaine HCL from GOMEZ approximately every two (2) to three (3) weeks.

4. On or about May 2005, the Drug Enforcement Administration Gulfport Resident Office and the Mississippi Bureau of Narcotics conducted an interview of a reliable cooperating source (herein referred to as CS1). CS1 advised that he/she was involved in the large scale distribution of marijuana and cocaine in the Hattiesburg, Mississippi area.

5. CS1 advised that he/she first began a drug association with Oscar J. GOMEZ sometime in the summer of 2004. CS1 advised that prior to GOMEZ, he/she was receiving approximately two hundred (200) pounds of marijuana and five (5) kilograms of cocaine HCL at a time from a Hispanic male named, "Lil Man." CS1 was first introduced to "Lil Man" by another Hispanic male named, "Mike."

6. According to CS1, most of the drug transactions were conducted at truck stops in Hattiesburg, MS. CS1 stated, most of the narcotics were smuggled into the area was done with the use of 18 wheelers. CS1 stated, the shipments were usually delivered by either two (2) Hispanic males or a black male, who each drove separately.

7. CS1 stated, in the Summer of 2004, he learned that "Lil Man" had been arrested in Alabama for an immigration violation. During the same time frame, CS1 was contacted by GOMEZ and told that he would be his/her (CS1's) new drug contact instead of "Lil Man." CS1 stated, his/her first meeting with GOMEZ took place at a Texaco gas station, in Hattiesburg, MS., located near 40th St. GOMEZ was driving a CS1 Ford Excursion. During the meeting, GOMEZ discussed future shipments of Cocaine HCL from Texas to South Mississippi for CS1.

8. CS1 stated, approximately two (2) weeks later, he/she started purchasing approximately five (5) kilograms of Cocaine HCL at a time from GOMEZ. CS1 stated, most of the Cocaine was "fronted" to him/her by GOMEZ approximately once a month. According to CS1, whenever GOMEZ returned to pick up money owed, he (Gomez) would also drop off the next shipment of Cocaine.

9. CS1 stated, on May 4, 2005, he/she met with GOMEZ at the intersection of Hwy. 49 and Hardy St. where he/she obtained ten (10) kilograms of Cocaine HCL from GOMEZ. During the contact, GOMEZ instructed CS1 that the Cocaine was of poor quality and agreed that CS1 would only have to pay $7,800 instead of the usual $18,500. CS1 agreed and accepted the ten (10) kilograms of Cocaine. According to CS1, GOMEZ was in possession of as many as three (3) cellular telephones at a time. CS1 stated, he frequently contacted GOMEZ at cellular telephone number, 210-834-4371.

10. On July 18, 2005, the Drug Enforcement Administration Gulfport Resident Office applied and received a federal "wire intercept" order for cellular telephone (210) 834-4371, subscribed to Oscar J. Gomez.

11. On July 29, 2005, the Drug Enforcement Administration Gulfport Resident Office intercepted a conversation between GOMEZ and his wife Paulina Freddie GOMEZ concerning drug proceeds. During the conversation, Paulina began to have a discussion about a shortage of $4000-$5000 in the money count for the drug proceeds. A money counter could be heard in the background. Paulina told GOMEZ, "I'm about half way through and everything is correct...I remember that it was '69' (believed to be $609,000), no?" GOMEZ stated, "613...I just talked to the guy and he told me it was 613." Paulina stated, "No, that's not it. I already have a headache. I haven't been able to do anything of what I had to do because I've been doing this [counting drug proceeds] since yesterday." GOMEZ stated, "Well, just leave it like that...when I get there, I'll look in the car." Paulina said, "If you want to, I leave what I already counted, do you want to

check the rest?" GOMEZ later said, "Yes...put it aside and we check it tomorrow, if not, let me see how I do it. It's a lot of money."

12. Intercepts continued until investigative efforts involving GOMEZ were halted because of Hurricane Katrina that ravaged the Mississippi Gulf Coast on August 29, 2005.

13. In February 2006, the Gulfport Resident Office re-established investigative efforts into the Oscar GOMEZ Drug Trafficking Organization. Continued efforts in the new investigation led to an undercover meeting between TFA Marcus Bass, and CS1 and GOMEZ on February 14, 2006. During that meeting, GOMEZ negotiated to supply TFA Bass with one (1) kilogram of cocaine HCL.

14. On February 16, 2006 members of the Drug Enforcement Administration Jackson Office were conducting surveillance on an identified target Michael TRAVIS. TRAVIS was followed to the E.Com Lodge Hotel, located off of I-55S in Byram, MS where he conducted a suspected drug transaction with a Hispanic Male, later identified as Michael MARTINEZ, 7526 Stagecoach Rd. San Antonio, TX. The Gulfport Resident Office later learned, through wire intercepts over the GOMEZ phone, that MARTINEZ had provided TRAVIS 20 kilograms of cocaine HCL. Later that same day, TFA Bass, working in an undercover capacity, obtained one (1) kilogram of cocaine and a Nextel push-to-talk phone from MARTINEZ.

15. On February 17, 2006, TFA Bass returned to the same hotel and obtained an additional 15 kilograms of cocaine HCL from MARTINEZ. The Gulfport Resident Office learned that MARTINEZ was operating as a money and drug courier at the direction of Oscar GOMEZ.

16. On March 3, 2006, TFA Bass, working in an undercover capacity, met with GOMEZ in Jackson, MS and paid him (Gomez) $21,000 dollars in official advanced funds as partial payment for the purchase of the 16 kilograms of cocaine on February 16th and 17th, 2006. TFA Bass dropped GOMEZ off at a Days Inn hotel, located at 106 Swinging Bridge Rd., Byram, MS. At that location, GOMEZ was seen by surveillance units meeting with a Hispanic male, believed to be MARTINEZ. GOMEZ was seen carrying a duffel bag into MARTINEZ's room. MARTINEZ traveled in a taxi cab with GOMEZ who was dropped off at the Jackson International Airport. MARTINEZ returned to the hotel in the taxi cab.

17. On March 3, 2006, at approximately 10:00 p.m., surveillance units watched as an 18-wheeler tractor trailer drove into the parking lot of the Days Inn hotel. The vehicle displayed a Venture Logistics trucking logo. Venture Logistics and Transports Inc. has been identified as a company employer for criminal associate and commercial truck driver Manuel VILLAREAL. MARTINEZ emerged from room 123 carrying a large duffle bag. MARTINEZ placed the bag into the cab of the truck and sat in the front passenger seat. The vehicle was followed onto Interstate 55 south and followed to the Mississippi/Louisiana state line. It was suspected that the vehicle was traveling to San Antonio, TX and then on to the border town of Laredo, TX.

18. On March 14, 2006, the Gulfport Resident Office learned that MARTINEZ flew from San Antonio, TX to Jackson, MS to participate in a suspected bulk currency payment from TRAVIS and undercover TFA Bass.

19. On March 15, 2006, members of the Jackson DEA Office located MARTINEZ as he flew into the Jackson International Airport via Southwest Airlines. Surveillance units noted that MARTINEZ checked into the same Days Inn hotel in Byram, MS. MARTINEZ attempted to reach TFA Bass by telephone to coordinate the meeting at the hotel but was unsuccessful.

20. On or about March 16, 2006, at approximately 12:40 p.m., surveillance units from the Gulfport Resident Office and the Jackson DEA Office followed identified target Michael TRAVIS from his residence to the Days Inn in Byram, MS. TRAVIS carried a large black duffle bag into room 105 of the Days Inn, located at 106 Swinging Bridge Rd., Byram, MS. The room was rented by MARTINEZ. Wire intercepts over the TRAVIS telephone revealed that the bag contained approximately $50,000 dollars. TRAVIS stayed inside the room with MARTINEZ for approximately seven minutes before departing the room. TRAVIS was carrying a blue bag that he placed on the passenger side of his vehicle.

21. Based on my training and experience, your affiant believes that TRAVIS delivered drug proceeds to MARTINEZ and simultaneously conducted a drug transaction with him (Martinez).

22. On or about March 17, 2006, at approximately 12:30 a.m., the Jackson DEA Office observed MARTINEZ leave room 105 of the Days Inn and walk to an orange tractor truck marked ITS. The vehicle displayed Texas license plate R5FL65. A computer database search revealed that the vehicle was registered to International Transportation Services, 9001 San Mateo Dr., Laredo, TX. The truck was attached to a white trailer.

23. On or about March 17, 2006, surveillance units followed the orange tractor trailer from the Days Inn and onto Interstate 20 west. At approximately 2:00 a.m., the Mississippi Department of Transportation conducted a stop of the vehicle in Flowers, Mississippi. The driver of the vehicle was positively identified as Eloy LIRA. MARTINEZ was identified as the passenger. Although the Gulfport Resident Office knew that the vehicle contained suspected bulk drug proceeds, no search of the vehicle was conducted since the purpose of the stop was only to identify the occupants. LIRA had been previously identified as a money and drug courier for the Drug Trafficking Organization. Based on previous DEA investigative techniques agents learned that LIRA is being, directed at the discretion of GOMEZ and that he has been tasked, on previous occasions, with transporting MARTINEZ and the drug proceeds back to Texas.

24. On March 30, 2006, at approximately 12:20 a.m., the Gulfport Resident Office overheard a telephone conversation between GOMEZ and a subject believed to be MARTINEZ. During the call GOMEZ said, "What happened?" [Referring to why MARTINEZ did not go to Jackson, MS on March 29, 2006 as directed by GOMEZ] MARTINEZ said, "I am going to be there like around six man." GOMEZ said, "What about that guy?" [Referring to possibly LIRA] MARTINEZ said, "I already told him. We are going to be there like around the same time." GOMEZ asked, "Did 'he' leave since yesterday or what?" MARTINEZ said, "This guy [LIRA] left yesterday and he had to sleep for a while...I already spoke to him, he is just going to have to wait an hour or so." GOMEZ said, "That's good. 'Chaparro' [TRAVIS] called me a while ago. I told him to get ready for the afternoon. They are going to eat [meet] there." MARTINEZ said, "Tell him that we are not going to eat in the same place, we are going to eat at the other one, the other place."

25. Based on the conversation, your affiant believes that GOMEZ was coordinating a meeting between TRAVIS, MARTINEZ and LIRA that took place on March 31, 2006 during which TRAVIS received bulk quantities of marijuana and cocaine. It is believed that GOMEZ and MARTINEZ were talking about not meeting at the same hotel to conduct the transactions but rather a different hotel. References to having to sleep for a while are indicative of a truck driver who is required by

Department of Transportation regulations to show a certain number of rested hours for every day of long distance driving.

26. On or about April 28, 2006, the Mississippi Department of Transporation conducted an inspection of an eighteen wheeler cargo transport vehicle, operated by Manuel VILLAREAL and Michael MARTINEZ in Vicksburg, Mississippi. Preceding the inspection the Drug Enforcement Administration Gulfport Resident Office and the Jackson District Office intercepted calls coordinating the pickup of currency from unknown individuals in Georgia and Michael TRAVIS in Jackson, Mississippi. The currency was for outstanding drug debts and was to be brought to Oscar GOMEZ in Texas.

27. Upon searching the eighteen wheeler officers, discovered a manufactured compartment underneath the dash board containing bundles of United States currency. A count of the currency yielded a total of $245,690.00. The Mississippi Bureau of Narcotics responded to the scene and interviewed VILLAREAL and MARTINEZ. MARTINEZ stated that the currency were the proceeds from drug distribution and that the currency was to be taken to an individual known only has "Juan" or "Jose" PEREZ in Mexico. MARTINEZ provided Nextel push to talk number 157*899*5004 as the contact number for PEREZ. Your affiant however is aware that 157*899*5004 is in the possession in Oscar GOMEZ and on March 24, 2006, the DEA Gulfport Resident Office received a federal court order ordering the intercept of wire communication of said push to talk number (157*899*5004).

28. Based on the above and foregoing information, Affiant Davis has probable cause to believe that Oscar J. GOMEZ, Paulina F. GOMEZ, Manuel VILLAREAL, Eloy LIRA, Michael MARTINEZ and Brooks STALLINGS.

I, Terry Davis, under penalty of perjury under the laws of the United States, do hereby, declare, certify, and state that the foregoing is true and correct.

_____
TERRY DAVIS
Special Agent
Drug Enforcement Administration

Sworn to and subscribed before me, this __3rd__ day of May, 2006.

_____
CHIEF UNITED STATES MAGISTRATE JUDGE